[No. 28817. Department One. December 3, 1942.]

EDNA E. JONES, *as Executrix, Appellant,* v. FRANCES M. DAVIS, *as Executrix, Respondent.*[1]

*Tyre H. Hollander,* for appellant.

*Clay Nixon,* for respondent.

BLAKE, J.—Lilly M. King brought this action, in her individual capacity and as administratrix with will an-

[1]Reported in 131 P. (2d) 433.

nexed of the estate of her late husband, William B. King, to establish a community interest in lot six, block twenty-five, of Lincoln Pontius' supplemental addition to the city of Seattle. The action was, in form, for partition, but the complaint was broad enough and the scope of the evidence sufficient to impress a lien upon the property for whatever community interest might be established. Mrs. King died prior to trial, and Edna E. Jones, her daughter by a former marriage, was substituted as party plaintiff. Subsequent to trial and prior to appeal, Mrs. Shuman died. Frances M. Davis, a daughter of Mr. and Mrs. King, has been substituted as party defendant.

William B. King and Blanche A. Shuman were brother and sister. In 1922, the property was conveyed to them as a gift by their mother. At that time, there were two small houses upon the lot. During his lifetime, King had complete management and control of the property, although, in 1937, he conveyed his interest to Mrs. Shuman by deed, which was filed for record in February, 1939. That this conveyance was intended as, and effected, a gift of his separate interest in the property to Mrs. Shuman, there is no doubt.

In 1928, King purchased and moved onto the property a two-story house, which he converted into two apartments. It is the contention of plaintiff that the funds with which this house was purchased and remodeled belonged to the community composed of William B. King and Lilly M. King. The trial court, however, found that the "evidence was insufficient to establish any moneys due said community which would be a lien against the said real property." Judgment dismissing the action was accordingly entered. Plaintiff appeals.

■■ William B. King's interest in the real estate, having been acquired by gift, was his separate prop-

erty. Its status as separate property was established as of the date of acquisition. *Katterhagen v. Meister,* 75 Wash. 112, 134 Pac. 673. And the presumption is that its status as such remained unchanged. *In re Sanderson's Estate,* 118 Wash. 250, 203 Pac. 75. If William B. King had separate property or income, it is also to be presumed that the improvements upon his separate property were made with separate funds. *Guye v. Guye,* 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186; *In re Finn's Estate,* 106 Wash. 137, 179 Pac. 103; *In re Woodburn's Estate,* 190 Wash. 141, 66 P. (2d) 1138. But these presumptions may be overcome and a lien in favor of the community established by proof that community funds, in a substantial amount, have been used in the improvement of the property. *Worthington v. Crapser,* 63 Wash. 380, 115 Pac. 849; *Jacobs v. Hoitt,* 119 Wash. 283, 205 Pac. 414. The burden of establishing a community interest in separate property is upon the person asserting it. *Guye v. Guye, supra.*

The question for determination, therefore, is whether appellant has sustained the burden of proving that community funds were used in purchasing and improving the house that was moved onto the lot. The evidence tending to establishment of the fact is entirely documentary—though, in some degree, circumstantial.

To begin with, an itemized statement in King's handwriting is in evidence, showing the purchase price of the house, the cost of moving it onto the lot, and the amounts expended for material and labor in repairing and transforming it into apartments. The total amount of such expenditures was $2,299.62. The items of expenditure, in this statement, are fortified by canceled checks drawn by King on the only checking account maintained by him. This account was in the Brother-

hood Bank and Trust Company of Seattle. It was carried in his individual name, but his checks bore the following caption:

"W. B. KING COMPANY
505 Pacific Block, Elliott 5640
USED PRINTING MACHINERY AND EQUIPMENT
MERCHANDISE BROKER"

King was a man who, at various times, engaged in diverse enterprises, all of which were dependent upon his personal supervision and energy. It is a fair inference that most of his earnings, if not all, found their way into his account in the Brotherhood bank. We think, too, that the inference is irresistible that these earnings were the community property of himself and Lilly M. King. For they were married in 1897, and there is no evidence that he had any separate funds invested in any of the enterprises in which he was engaged. That the funds deposited in this bank account were community property, there can be no doubt.

Furthermore, it is established by documentary evidence that King, during the period the house was being made into apartments, procured a loan on a life insurance policy, the proceeds from which found their way into the account in the Brotherhood bank, and were undoubtedly, in large part, checked out in payment of material and labor costs incurred in connection with the purchase, moving, and remodeling of the house. The proceeds of this loan were, of course, community property. *Occidental Life Ins. Co. v. Powers,* 192 Wash. 475, 74 P. (2d) 27, 114 A. L. R. 531; *Hanley v. Most,* 9 Wn. (2d) 429, 115 P. (2d) 933; *King v. Prudential Ins. Co. of America,* 13 Wn. (2d) 414, 125 P. (2d) 282.

During the period in question, King also procured loans from the Brotherhood bank on his personal notes, the proceeds of which went into his checking account. It is clear that the proceeds of these loans were used

in remodeling the house. The notes were, presumptively, community obligations. *Bierer v. Blurock,* 9 Wash. 63, 36 Pac. 975; *Reed v. Loney,* 22 Wash. 433, 61 Pac. 41. But, apart from the presumption, we are convinced by the evidence that they were paid off with community funds. For there is no evidence in the record justifying any inference that King had separate income or funds with which to pay them. He had one other piece of separate property, but the income from that and the property in controversy was negligible.

Mrs. Shuman testified that, in 1920, her mother gave her and King five thousand dollars, the whole of which was turned over to the latter for management and investment. Of this, it is clear from documentary evidence in King's handwriting that he paid four thousand one hundred dollars to Mrs. Shuman prior to the time their mother gave them the property in controversy. What became of the other nine hundred dollars, does not appear. He bought the house in question April 18, 1928. The first of that month, his total bank deposits amounted to $290.63. In view of the manner in which he handled his bank account, this sum cannot be regarded as other than community property. As the court remarked in *King v. Prudential Ins. Co. of America, supra,* p. 248:

"There is some evidence . . . that Mr. King had a small income from separate property, but, whatever this was, it was commingled with community funds and became community property."

We conclude that, when King gave his share of the property to his sister in 1937, it was impressed with a community interest in the sum of $2,299.62. While he could give away his separate estate, he had no power to give away the community's interest in it. *Parker v. Parker,* 121 Wash. 24, 207 Pac. 1062; *In re McCoy's Estate,* 189 Wash. 103, 63 P. (2d) 522.

Since there is no element of estoppel to preclude appellant, as executrix of Mrs. King's estate, from asserting the community interest in the property, the judgment will be reversed, with direction to enter judgment impressing a lien upon the property in the sum of $2,299.62.

ROBINSON, C. J., MILLARD, STEINERT, and JEFFERS, JJ., concur.